Case No. 18-7161, De Depu v. et al. Appellants Young-Soo Lee v. Yahoo! Inc. et al. Mr. Wong for the appellants, Mr. Kisabell for the appellants. You may place the court. Time is long for the plaintiffs. Your Honors, the mere fact that this hearing is even taking place is, for my clients, a triumph. In China, it's routine for people with money and connections to wield power with impunity, and for a time, that's exactly what my clients feared would happen here. That no one would ever be held to account for the profound corruption of the Yahoo! Human Rights Fund at the heart of this case. An injustice, Your Honors, that defendants have all but admitted, and one that continues unaddressed to this day. Now we're here on a Rule 12b-6 motion to dismiss a complaint subject to Rule 8 pleading standards. As such, this appeal asks two main questions. Let me interrupt you. Your action is not a class action, correct? That's correct. And so what, if any, estoppel would there be from other potential beneficiaries for bringing another suit? Let's see, even if you were to bring this suit to conclusion, let's assume that we reverse and send it back, and then you lose on the merits. What's to stop somebody else from bringing the same lawsuit? Well, I suppose that would depend on the reason it was we lost on the merits, Your Honors. Let's suppose the district court finds that there's no trust. No trust was created, and we affirm that. What's to stop somebody else from bringing another lawsuit? Well, I believe that would be a final judgment on the merits. I wouldn't be dispositive of the issue of whether a trust exists in this case. Even if they weren't a member of the plaintiff class? I believe so, under res judicata, Your Honor. And the Hooker case was a class action, so it was clear that any member of the class would be bound by res judicata. Ordinarily, non-parties aren't bound by res judicata, right? That's right. But I believe even now, it would be perhaps the collateral estoppel, the issue of whether a trust exists has been litigated and decided in this case. And I think it – I'm not sure it matters whether you're a member of this formal – you know, the fact that we haven't brought this as a class action means that another beneficiary could try again without risking collateral estoppel. Well, the reason I'm asking about this is that it seems that the fundamental purpose of this, you know, exception was to allow private suits in circumstances where they couldn't be repetitive and so – where they wouldn't deplete the trust assets and kind of be harassing to the trustees. So this is a pretty important issue, but – and that seems to have under – you know, been an underlying rationale that the D.C. Court of Appeals used in Hooker and also in Family Federation. So it seems to me that it's a problem for you if indeed there could be repeat litigation. And there's already been repeat litigation here, right? Because one of your plaintiffs had brought the claims previously, right? Not under a trust theory, not – certainly not to enforce the humanitarian fund that we're seeking to enforce here. Now, to Your Honor's concern about repeat litigation, there are a number of protections in Hooker that we meet here that would apply. One of the most important ones being the nature of the challenged conduct. So as Your Honor will recall, the second prong of the Hooker test is that the nature of the challenged conduct has to be, you know, something egregious, something that's not something that's committed to the discretion of the trustees. So when my colleagues say that, you know, warn about a rash of litigation that's going to result from people challenging spending decisions from 12 years ago, that's not what this case is about. This case is about something deeply fundamental, which is the termination, the complete termination of this fund entirely. And under Hooker, that is one of the key protections for preventing the concern Your Honor just raised. Turning to the merits of whether – go ahead. Family federation, this is another case where standing was granted with respect to extraordinary circumstances. Is that right? Correct. Is that a class action? It was not. So is it a possible answer to the questions that we've been discussing here that that's what makes this different, that it's an extraordinary circumstance? It's not just to get benefits from a trust. It's to prevent the trust from being lost altogether and that those extraordinary circumstances only happen once. That's exactly right, Your Honor. In fact, you know, if we hadn't been able to show that, we wouldn't have special – If we hadn't been able to show the extraordinary circumstance, we wouldn't be able to plead special interest in the first place. I think it's telling, Your Honor, that defendants have never challenged that we've met that problem. They've conceded that this is an extraordinary circumstance. Now, on family federation – Sorry, I interrupted Judge Wilkins. No, thank you for that. What are we to make of the significance of the trust that was created in 2009? Well, Your Honors, I think it actually proves that the document in 2007 manifested trust intent for two reasons. So by its own terms, the documents creating the 2009 trust said that it was being created pursuant to the settlement. Now, how could a trust be created pursuant to a document that, as my colleagues say, disclaims trust intent? So that's one reason. The second reason is that think about where the money for the 2009 trust came from. It came from bank accounts in the LRF's control. And yet the donor of that trust was deemed to be Yahoo. Now, there's only one explanation for this, which is that money might have been in the LRF's bank account, but it didn't belong to the LRF. And that's because the LRF was holding it as a trustee. It didn't have full title for the money. And the lack of full title, divided title, is the defining feature of all trusts, including charitable trusts. So I don't think the 2009 document helps defendants at all. In fact, I think it veritably proves that there was trust intent in 2007. How do we know that the donor was Yahoo for that trust? It says it explicitly, Your Honor. Is that at, what is that, JA-192? 129. 132 says, JA-132 says disagreement in declaration of trust between Yahoo and, parenthetical, the donor. That's right. Is that? Yes. That's the relevant part? Yes. Now, turning to the other reasons that we believe that we've clearly met our pleading standards here for trust intent, the law is clear that this is a broad and fact-specific inquiry. Trust intent is a fact-specific inquiry. As the Family Federation Court put it, and by the way, the Family Federation case was also about a charitable trust. Trust intent may be established by written or spoken language or by conduct in light of all surrounding circumstances. Now, remember, Your Honors, there, the lone allegation in support of trust intent was that 30 years earlier, the donor had orally instructed someone to open a bank account for the church's benefit. Over strenuous objections, the court there, citing the standard I just described, held that that was enough to meet the plaintiff's pleading group. By comparison, Your Honors, our allegations here are, frankly, an embarrassment of riches. And to list just a few examples, here we've alleged that there was a written directive that all relevant payments were to be, and I quote, made in trust to the LRF. We have a written set of instructions using mandatory language, which this Court in the Beckett case held was a hallmark of trust intent, that the LRF could spend the money on, quote, three purposes only, the first of which was humanitarian assistance. We have an undisputed allegation that Yahoo was motivated at least in part by humanitarian and charitable impulses, which isn't necessary for charitable trust intent, but certainly supports it. We have a written prohibition on commingling, which courts routinely cite as evidence of trust intent. We have an allegation that the LRF, in fact, did not commingle, which the case law also says supports trust intent. And we have paragraphs upon paragraphs of written instructions restricting how the LRF could use the money, which further undermines the notion that it was somehow some kind of gift to the LRF, which the district court's holding would seem to imply. Can I ask this question, which is how does the pleading standard, you've referenced the pleading standard a couple of times, how does it interact with the subsequent course of events under the way you're looking at the case? In other words, you think the district court got it wrong under the pleading standards on the threshold question of whether there's an intent to create a charitable trust, and then there's also the second question of whether there's standing because the hooker criteria are met. And then there's a plausibility overlay that accompanies the fact that the resolution was made under 12b-6. And so if we were to rule in the way that you wanted us to rule, if the Court was to rule the way you wanted the Court to rule, which is to say actually both of those get past the plausibility standard, then what's left to be done on those issues? You mean as the case proceeds? Yeah, because it's one thing to say that it's plausible to say that you've done enough under the intent to create a trust and then under the hooker question standing. And then by hypothesis, then something more would be done to determine whether it's not just plausible, but actually you get all the way home. And what else is there that would happen in the proceedings that we don't already know about? Well, on trust intent, Your Honors, our position is that we've basically proved it. But, I mean, some of the discovery that might go into this issue from the defendant's perspective, for example, or from everyone's perspective is, for example, e-mails. E-mails that if the defendants are using the words trustees to describe themselves, I think that would be probative. How about on the second question, on the hooker one? So on the trust one, I take your point, then how about on the standing question? Well, to play devil's advocate, if I were defendants, I would probably take discovery on whether my clients in fact are Chinese that have been imprisoned for freedom of expression, for exercising their freedom of expression, issues like that. I would take discovery on what is the actual size of this beneficiary class. What about the question, you refer to subsequent guidelines and refinements as to who the class is. So I take it that kind of discovery would reinforce your view that it's limited only to Chinese who have been imprisoned for statements on the Internet? It would clarify that it's narrowed in that way. So just backing up a bit, we don't say that the class is exclusively limited to Chinese dissidents, but discovery... For purposes of this case where you only have to be sufficiently representative with a special interest to raise that issue, that's a separate issue from who's in the whole class, isn't it? Right. You want to stop an extraordinary event. That's right. For that purpose, the D.C. law is you don't have to be the same as everybody in the class. I don't mean in the sense of a class action, but in the class of beneficiary. That's right. So, for example, even though all people who might someday move into the hospital might someday become old enough, but right now our young women, people who are not in that situation but in fact have lived in the hospital and were old enough, in the house, I'm sorry, would be sufficient. That's right. Under Hooker, you basically take a snapshot at the time of the lawsuit. You don't worry about people who might become beneficiaries in the future. And under Hooker, you also focus on preferred beneficiaries. So some discovery on the guidelines, for example, might include that, for example, we attached to our second amended complaint where defendants are saying, you know, this fund is really meant for, you know, Chinese online dissidents. And, you know, Harry Wu, the LRF, you guys are not, you guys are deviating from that. I see my time has expired, Your Honor, so. There's a few statements in your amended complaint, paragraph 33 and paragraph 49, the first about a meeting in an ante room and 49 about draft guidelines. And 49 and 50. Presumably you have witnesses who verify those statements? Certainly, Your Honor. So that would, I take it, be the subject of deposition at least for summary judgment and then, is that right? Absolutely. The guidelines that you refer to at 49 and 50, those, we don't have those, is that right? These are guidelines that. Right. Those are not the guidelines that defendants attached to their motion. So these are. The guidelines that are cited in the complaint predate those guidelines. So these are something you would be looking for in discovery? Absolutely. Okay. Any questions? Thank you. Thank you. May it please the court, Matt Fitzgerald for the appellees. For two separate independent reasons, the judgment of the district court should be affirmed in this case. First, the simpler of the two is no standing. That is, the plaintiffs in this case lack standing under Hooker v. Edith's Home to enforce this charitable trust. Hooker created a narrow exception to the general rule that only the Attorney General may sue to enforce a charitable trust. That narrow exception requires a special interest, and that's defined as a small class that is limited in number and sharply defined. In applying that rule in Hooker, the court found standing for a class that was limited to female, elderly, indigent widows in certified good health who were residing or willing to reside in the Georgetown neighborhood of Washington, D.C. The case was fundamentally about an 18-room boarding house that through 80 years had never been full. The size and scope of the class in that case is fundamentally different than the one the plaintiffs claim here. The class here, straight from the alleged trust document, is, quote, primarily to persons in or from. So can I ask, in Hooker, in discussing a prior case, YMCA, the court said, for our purposes, YMCA merely underscores that the essence of a special interest in a charitable trust is a particularized interest distinct from that of members of the general public. So it's conceiving of the work being done by this filter as distinguishing the circumstances from ones in which you're just talking about the generalized interest of members of the public. And at that level of generality, do you think that there's something narrower going on here? Well, Your Honor, yes, something narrower is going on here because, in some sense, every beneficiary class is somewhat narrower than the entire public. You know, a classic charitable trust would be, say, for a church or a certain religious purpose. But we have examples of the application of the Hooker rule to churches that find the standing still too broad. So, for instance, the Williams case, Williams v. Board of Trustees, the court was looking at a class that was composed of people who regularly attended or donated money to a single church in a single place and still found it uncertain and limitless. And so I think what's really being gotten at there is it needs to be a small class, sharply defined, limited in number, so that the court can feel like the whole issue is in front of it when these people have come forward. And so what we have here is six or seven people. What do you mean the whole issue is in front of it, meaning that there will be collateral estoppel? If someone else comes forward on that same issue, I'm not sure I understand what you mean. Well, I think I'm trying to explain where this rule that requires sharply defined and limited in number comes from. And when we look at Hooker and we look at Williams, what it appears that the court is worried about is that when you have a small number of a much larger class coming forward, there could be these sorts of problems. There could be repeated litigation. There could be other people, part of the beneficiary class, who have different interests, who wish that the money were used for some other specific thing or would like more of it for themselves. Well, the thing that's kind of counterintuitive about that is that, I mean, it seems that the basic underpinning of Hooker is we don't want repetitious lawsuits. So one way to deal with that is to have a class action and everybody in the class is bound. So that would kind of counsel towards bigger classes. But you're saying, no, the class should be smaller and kind of more carefully carved out and narrowly identified so that the whole issue is before the court. But that's kind of, I mean, I'm just trying to get an understanding of where your argument takes you. Sure. So I think one way to do it is to just compare this case to Hooker. So in Hooker, it's this carefully defined class. The trust in that case had been operating for like 80 years, and they had had very few applications. They were struggling to fill this 18-room house. And so when a handful of people came forward, and the court did contrary to what the plaintiffs say project forward in a way in Hooker because it pointed out that part of the reason there was such a problem getting more people to come forward and want to be in the class is that the house wouldn't let you live there anymore once you needed, once your health declined in old age. And so they said it makes sense that they've had a really hard time finding anyone. So you're just looking at a scale that's so different than in this case. Because here, even according to what the plaintiffs say, they say it's 800 to 1,200 people spread around the world. And they seem to acknowledge, I think, that if the Chinese government or another government, but particularly the Chinese government, to take their narrowest view, were to crack down on dissidents tomorrow, you know, there could be hundreds or thousands of new class members without warning who haven't been spoken for and don't have any say. In Hooker, didn't the court acknowledge that the class there could be in the hundreds or perhaps even in the thousands? Didn't they say that? I don't think that that was alleged in Hooker, Your Honor. But the actual analysis in Hooker where they defined the class and they looked at who the people were and they discussed the history of difficulty finding any applications, I don't think they acknowledged that the actual plausible class was of that size. Isn't the emphasis on Hooker, though, on the fact that the trust was at a crossroads and that if these representatives were not permitted to stop the transfer, that would be the end of the entity altogether? And isn't that really what's the real motivating factor behind permitting this kind of substitute for the attorney general, that if these representatives can't bring it, then no one can? And the argument that others may want something different, well, once the fund is eliminated, there won't be anything different for those people. Well, Your Honor, there's, of course, the attorney general who can enforce it. This situation could also have been enforced by YAHOO under their pleading as the alleged substitute. The allegation is that YAHOO is the wrongdoer here, so that seems unlikely that they would be enforcing it. We have to accept that. I'm not saying they are the wrongdoer. I'm just saying that's the allegation. So the idea that YAHOO would be enforcing the prevention of a transfer that YAHOO wants seems very – Well, Your Honor, there's no reason to believe that the attorney general doesn't do its job in enforcing it. Well, but the whole point of Hooker is the attorney general has a big job with lots of different things to do. And, by the way, he wasn't called the attorney general then. There was no attorney general who could in those days. It was only the Corporation Council. But the attorney general has a big job. And the point here is there are lots of things and there are lots of charitable trusts. And if that's all the attorney general did, the attorney general wouldn't be able to do the rest of his job. So where you can define a class of representatives who have a sharp interest in a major change in the structure of a fund – assuming, again, that there is a fund, assuming that it's – we're on 12B-6, so we have to – why don't these people seem like logical representatives of that claim? Well, I think, Your Honor, one thing that's getting lost here is Hooker required both the fundamental challenge and the small, limited, sharply defined class. And so what plaintiffs have argued here is a fundamental challenge in some sense. But embedded in it is also their claim that they wish to have funds from the alleged trust themselves. And so what you can see in here is the seeds of the problem for that element as well. But the bottom line is, I think, Hooker requires both. And what they don't have here is this small, sharply defined class. You haven't contested the other element, right? I'm sorry? You haven't contested the other element. We haven't contested that element. But you can see it's not that the sole challenge is this fundamental challenge. They want for themselves a piece of the trust, and they say that in a few places, including page 2 of their opening brief. And so we just don't have this small, limited class. I mean, even on the face of their complaint. So on the small, limited class part of it, so then Hooker also says this at the end. All such members, meaning the members of the plaintiff's group that they're talking about, have a present opportunity to enjoy direct benefit differing markedly from the incidental and indirect benefit the public realizes from the housing of indigent elderly widows. And so getting back to the question of drawing a distinction between the general public and the particular folks whose putatively concrete interests are at stake, it seems like the concern is about the incidental and indirect benefits that could hypothetically be realized by the public at large, which you can often see in charitable trust situations because if it's in fact a charitable trust, then it's serving a broader interest that indirectly and incidentally benefits the public at large, even if you're not one of the more direct beneficiaries. And if you're looking at it on that axis, then here you're not talking about incidental and indirect beneficiaries vis-a-vis the public at large from achieving humanitarian goals, but you're talking about subpopulation of individuals who are more directly benefited by the alleged purpose of the charitable trust. Yes, Your Honor, except when we're talking about it can't be that any time you can identify a subpopulation, that that's good enough to allow those people to come forward and enforce the trust because that's true pretty much all of the time. So in other words, here you could say, well, the whole world benefits from support for freedom of speech. No, I take that point, but it's degree of directness, and it seems like the particular group of individuals who are in play in this case have a degree of directness. They're kind of at the core of what the purpose of the transfer was all about. They allege that, Your Honor, but I think that the problem here is that that core is still incredibly broad, and there are many people out there who could have different interests than these plaintiffs who we don't have. And there are hundreds of new people every year in China, according to their complaint alone, who are suffering this imprisonment. And so the core purpose of Hooker in keeping it small is not satisfied here. The second issue is that there's no charitable trust at all here for lack of charitable trust intent. There are several elements in the settlement agreement that is alleged to have created the trust itself that show a lack of charitable trust intent. What's our standard here, though, once again? It's only that it's plausible, right? Correct, but the substantive standard here is a clear manifestation of charitable trust intent. Well, the question is whether it's plausible that there's a clear manifestation. Exactly. That's a phrase that was used only once, I think, and didn't have any effect on the result in that case. But even so, the overriding issue is whether their claim is plausible. You have a document that says that money has to be held in trust. Isn't that right? Yes. All payments made in trust to Foundation, right? Yes, it says that in one place. Doesn't that make it at least plausible that it's a trust? No, it doesn't because of the other aspects of the agreement here. So, for instance, the fact that virtually all of the money could have been used to protect Yahoo! from further litigation. And, in fact, when we look at the three purposes laid out for the money, the only one of those that the Fund is under an obligation to spend it on is the indemnification of Yahoo! We also have these disclaimers of third-party beneficiaries, which are, in fact, even a little broader than that, because they say, quote, this agreement shall inert only to the benefit of the parties. Can I ask a question about the first point you made just a second ago before the third-party beneficiary, which is that you focused on the second objective of the Fund, which is to resolve the claims? Yes. Yes. So with respect to that, that's not inherently antithetical to creation of a trust. Is that – is it? It's inherently antithetical to the creation of a charitable trust. And if it's not a charitable trust, then the plaintiffs lose here? And so why is it – if it's not inherently antithetical to the creation of a trust as opposed to a charitable trust, and there was the creation of a trust, then why wouldn't it be the case that the words in trust say that, yeah, there's a creation of a trust with respect to the claims resolution? Positively. Positively, with respect to the claims resolution, it's not a charitable trust. But with respect to the humanitarian goals, it sounds in a charitable trust. Because that's the entire body of the money, Your Honor. So in other words, it's worth – You can't have a trust that doesn't – that is – You're not going to have – you shouldn't have a – you cannot have a charitable trust when the entire body of the money can be used for a non-charitable purpose. And beyond can be, but is primarily obligated to be had more claimants come forward. So I think it's worth just briefly, if I may, saying what was going on here. So there had been this congressional testimony. It was discussed in front of Congress, this litigation. The members of Congress essentially told Yahoo to get it settled publicly. And so Yahoo makes sense. It's concerned that there will be many more people coming forward like these original plaintiffs. And so with Harry Wu, who was speaking for his organization and for the Chinese families as their power of attorney, they settled and they paid $3 million each to the families and $17 million to Wu's organization. And so what they got in return is this indemnification. So the fund, the foundation, had to use that money to indemnify Yahoo against claims from anyone else should they have come forward. And so there just is not in all of that charitable trust intent. And the plaintiffs need there to be this charitable trust in order to bring this case. So I'm looking at the, I think it's Bogert's Trusts and Trustees, which everybody has cited on both sides, including the D.C. Court of Appeals, on mixed trusts, says that a mixed trust can be one which is administered concurrently for both charitable and non-charitable purposes. What case held that, I think you're trying to define this as okay, that's all right, as long as all of it couldn't be used for one or the other. Is that what you're saying? All of it for a clearly non-charitable purpose. And what says that? I think that that. What case or treatise says that? That's the first question. So I think in Bogert it refers to when mixed trusts have been upheld, that the non-charitable purpose is normally minimal by comparison to the charitable one. I think it might be in that same section, which I think is 372 or one of the nearby sections. That's the right section. Go ahead. It says what? So it says normally when this is okay, the non-charitable purpose is very small by comparison to the charitable purpose. And I don't think that's here. I think that because these first two families had settled for $3 million, that even just a handful more people coming forward based on this publicity could have exhausted this whole fund for the purpose of Yahoo's purchase of the piece. And that is not a charitable, it doesn't show charitable. Well, I'm really not clear about this. So a trustee has a fiduciary responsibility, right? Yes. And if the trust has mixed purposes, doesn't the trustee violate their fiduciary responsibility by giving all of it to one purpose and not to the other? No, not in this case, Your Honor, because the second purpose, the purpose of protecting Yahoo, is contractually agreed. They're obligated in a way that they're not obligated for either of the other two. What if there were an internal e-mail from the founders of Yahoo saying, we intend this to be a trust, we intend for this money to be spent for Chinese dissidents who were imprisoned because of use of the Internet, and we do not intend for it all to be spent for some other purpose. Would that not be enough to make a trust here? No, Your Honor, because that would be extrinsic evidence that we wouldn't, I don't think we need to get to that point. Whether we need to is a different question. All the case law and all the treatises say this can be oral. It doesn't have to be written. So why can't the oral statements indicate a trust? Well, the plaintiffs have not alleged the oral creation of a trust. They've alleged that the way they've... Maybe I should add to that, that conduct and spoken words, I think that's exactly the phrase, can be used to determine the intent of the donor, right? Yes, Your Honor. So what if the donor, which I take it is Yahoo here, in some way, has statements saying, this is our whole purpose, this is why we're doing this, and we want credit for it, this is the way we're going to get credit, we're going to create a foundation in trust for dissidents with these characteristics. This is not a contract in that sense. The law about trust is that spoken words, what you say extrinsic evidence, can help define the intent of the donor. Well, but so here the allegation is that the settlement agreement itself created the trust. And so what I'm saying is in the settlement agreement we have enough language, the clear meaning on the face of the settlement agreement, to see that there is no charitable trust intent. And so we don't get to that stage. What case says that if there is extrinsic evidence with respect to a trust, that is with respect to the intent of the donor, that we can't look at that? I'm not sure, Your Honor. I think it just comes from the fact that we're at the motion to dismiss stage, and the allegation is that a particular document has created a trust. And so we're saying, well, when you look at this document, you can see the absence of one of the elements. You think they've said we think the document itself and that we are foreclosing any reference to external evidence about the intent? I mean, the complaint includes external evidence about the intent of the donor. Yes, but if the document itself shows that there is no intent, then I don't think we get to an analysis of that, Your Honor. But you can't cite a case for that proposition? No, it's just the – I believe it's the motion to dismiss standard and the statement that the Wang settlement is the foundational document that creates the trust. I have one follow-on question to this, which is suppose that – suppose – I know this is not your argument, but suppose that it's appropriate to take account of extrinsic evidence, just to say that for a second, and the extrinsic evidence consists of the kinds of things that Chief Judge Garland was just taking off. And if that's the case, then would you say that your principle about how mixed trusts operate would still mean that even in that instance that it wouldn't – the thing that was created wouldn't constitute a charitable trust because there's too much of the claims resolution part of it, even in the existence of extrinsic evidence of the kind that's positive? Yes, Your Honor, because the claims resolution part of it is a contractual obligation on the foundation, and that's not true for the other purposes. So if a lot of – It just occupies the field. In other words, once you have a claims resolution – the way you look at it is once you have a claims resolution aspect, it doesn't matter how much extrinsic or even intrinsic evidence there is of a charitable component. The claims resolution part just occupies the field. You just don't have a charitable trust, yes. You have a trust where the primary – even if you're saying there's a trust, it's a fund or a trust where the primary object is the commitment to protect Yahoo! in litigation, and so there is no charitable trust there for the plaintiffs. Even if it says – suppose it's worded so that it says the primary object is the humanitarian part and the secondary object is claims resolution. If it says the secondary object is claims resolution, and by the way you're obligated to indemnify Yahoo! against any claimants that Yahoo! sends to you, then yes. You would still say occupy the field? Yes. Okay. It doesn't say you're obligated to use the money to resolve claims. It just says it may be used for three purposes. Your Honor, I'm on A176, and it says the foundation hereby agrees to use the fund to indemnify and hold Yahoo! harmless from and against any claims, liabilities, damages. I'm sorry, what – it's a long page. A176. Yes. Under Romanat II you're talking about. Yes, the lower part of that paragraph. So essentially it envisions that if there are any other claimants, Yahoo! is going to refer them to the fund, and the fund is agreeing to use it to indemnify and hold them harmless against any and all such claims. I'm sorry. That says in their implementation of 2B, that's the to resolve claims part. Yes. And in Romanat I – I like that word, Romanat, thank you – it says in their implementation of Part 2A, the foundation agrees to use best efforts to maximize the benefits achieved through the use of a portion of the YHR fund for humanitarian and legal assistance. So, you know, maybe you have a confused trust, I suppose. Maybe there's some term for that. But 2 only comes into play with respect to how to resolve 2B. It doesn't go into what to do about 2A. And if you're supposed to use your best efforts to maximize the benefits achieved, that suggests that way – well, maybe one way to do that is to not pay out Yahoo! claims. Well, no, Your Honor, because under 2, I don't think they could do that. And I think actually the right way to view it is if many other claimants or other claimants had promptly come forward, as the parties were concerned about based on this publicity, Yahoo! would refer them to the fund. The fund was then – hereby agrees to use the fund to indemnify and hold Yahoo! harmless. And that use of the money essentially bleeds into 1. I mean, it is in some sense humanitarian, though it certainly isn't charitable to pay millions of dollars to the families of people imprisoned, even if those people are suing Yahoo! So for these reasons, I respectfully ask this Court to affirm. Thank you, Graves. Is there time left? We'll give you an extra two minutes at the end. We apparently always do that. Thank you, Your Honor. Eventually, litigants will get the idea. Nobody out there will pay attention to this. Go ahead. It's about the mixed fund problem. Pardon? The mixed fund problem that we have. Yes. So D.C.'s uniform trust code is very clear. A charitable trust may be a portion of a larger non-charitable trust, and I think that's pretty dispositive of that argument. Also here, there actually is evidence that Yahoo! didn't intend for all of this money to be used to resolve claims. I mean, they carved out in 2009 less than a third of it, 3.55 million for that purpose. So I think that argument is also dead in the water. On the standing issue, recall that Hooker had two concerns, or explained that there were two concerns underlying the traditional rule. One was about size, which would invite recurring litigation, and the other one was about indefiniteness. So my colleague mentioned the phrase sharply defined many times here, but they've never challenged that the problem here is that there's an indefiniteness problem that would create a justiciability issue. So what they're really complaining about is just size. But the only way they can complain about size is to point at all the people outside of China and to point at all the people who might become beneficiaries. But those arguments are just flatly foreclosed by the facts of Hooker, so we think that that argument is foreclosed by the facts of Hooker. So you can't look at, you can't complain that the class is too large by pointing at all the people who might benefit in the future and all the people who are outside the preferred status. That's the only way they can really distinguish Hooker on the size issue. I submit these in no way to distinguish Hooker. Further questions? Thank you. Thank you very much. We'll take the matter under submission.
judges: Garland, Srinivasan, Wilkins